**PAIRPEARL PRODUCTS, Inc., v. JOSEPH H. MEYER BROS. et al.**

**No. 37.**

District Court, D. Maine, S. D.

May 2, 1932.

Verrill, Hale, Booth & Ives, of Portland, Me., for plaintiff.

Darby & Darby, of New York City, for defendant.

PETERS, District Judge.

This is a suit in equity for infringement of two United States letters patent granted to one Paisseau, No. 1,525,317 on February 3, 1925, application filed August 10, 1921, and No. 1,760,771 on May 27, 1930, application filed February 9, 1925. The answer denies infringement and questions the validity of the patents.

The subject-matter of both patents is the method of treatment of the minute particles of organic matter known as "guanin" obtained from the skin of certain fish. This substance is what gives the shiny appearance to fish like the herring and the alewive in this vicinity. It is stated in a publication of the United States Bureau of Fisheries put in evidence (Taylor) that: "In the fishes guanin is put to the useful purpose of camouflage. Most of it is deposited on the belly side of the fish and makes a bright silvery appearance to blend with the sky as seen from below by the enemies of the fish." It has been assumed in the trial of this case that these particles of guanin, referred to as crystals, were found wholly in the scales of the fish. Mr. Taylor, a scientist of repute, author of the above-mentioned publication, says that "as a matter of fact the luster of the guanin crystals is not found in the scales but is deposited in the epidermis of the fish, parts of which adhere to the scales when they are removed from the fish." These crystals of guanin are separated from the membrane of the fish by certain methods which have been the subject of discussion in this case, and, when so separated, collected,

and processed, constitute what is called "Essence d'Orient," or, commonly, pearl essence, used largely in the manufacture of artificial pearls, and giving, when properly applied as a coating, a beautiful luster to glass beads. The business of preparing pearl essence in connection with the manufacture of artificial pearls is an ancient one, having been established hundreds of years ago in Europe.

Both patents above referred to are now owned by the plaintiff herein. The matter of the first patent will be the first considered.

One of the initial questions to be considered, determination of which will settle several points raised against the patent, is the nature of the process specified.

It is claimed by the defendants that the method described in the patent, of separating guanin crystals from the proteinaceous and other substances, necessarily adhering thereto when taken from the fish by the rubbing off of the scales, is a process of dissolving, destroying, or digesting the softer material other than the crystals; whereas the plaintiff claims it to be a process more in the nature of a separation or cleansing of the foreign matter from the crystals, and not primarily a dissolving or digesting process. If it were the latter, as claimed by the defendants, it is quite clear that the invention would be anticipated by the publication of the United States Bureau of Fisheries above referred to, because a process in that publication, and in notes of Mr. Taylor, made about 1920, used at the trial, indicate disclosure of the process of digestion some time prior to the application. It is true that the language of the patent is clumsy, somewhat ambiguous, and lends itself to a possible construction such as claimed by the defendants; but the language should be construed in the light of the fact that the agent of the process described in the patent is not one coming within the class of digestants, and that the extract given by plaintiff in its brief, taken from the record during the prosecution of the application in the Patent Office, including the elimination of certain words from the original specification, indicate clearly that a more correct description of the invention is that given by plaintiff's counsel to the effect that, in substance, the invention of the patent, as claimed therein, resides in the treatment of guanin crystals imbedded in or surrounded by proteinaceous material with a detersive agent possessing detersive properties similar to those of soap

and saponin, whereby the proteinaceous materials and impurities are removed from the crystals and entrained in the detersive agent, and then separating the cleansed crystals from the detersive agent and the proteinaceous material and impurities entrained therein.

The invention of the plaintiff, as claimed, is principally in the substitution of a soap or saponin for other agents previously used in separating the crystals of guanin from the material in which they were imbedded, resulting in much saving of time in the commercial process. Claims 1, 2, 4, and 5 of the first patent are in suit. Claim 1 is as follows: "A process of preparation of pearl essence comprising in treating the raw material containing the brilliant crystalloids with a reagent which is susceptible of readily removing the protoplasm wherein the said crystalloids are imbedded, after which the crystalloids thus set free are separated from the said reagent before being acted upon by the latter."

Claim 2 differs from claim 1 only in that it adds the employment of heat during treatment.

Claim 4 differs from claim 1 in that it identifies the initial material as silvery parts of the bodies of fish.

Claim 5 is limited to the use of saponin as an agent.

The claims are very broad and general in their language, but, taken in connection with and read in the light of the specification, they are sufficiently definite to cover the process of using soap or saponin or other materials having detersive properties similar to soap or saponin for the purpose mentioned. "Meritorious patents are frequently saved by interpreting the language of the claims so as to include restrictions on limitations appearing in the specification." Standard Brands v. Federal Yeast Corporation (D. C.) 38 F.(2d) 329, 338, and cases cited.

The question of infringement of this first patent rests upon the alleged use by the defendants of various soaps in its plant at Eastport. It is not disputed that during the season of 1931, prior to August 5th, the defendants used soap and saponin in their process of preparing the pearl essence. The operations of the defendants were conducted in practically the same manner in which the process of the first patent has been carried out by the plaintiff and its predecessor in title since about 1923. There is no doubt that the operations of the defendants re-

ferred to, using soap or saponin, were an infringement of the first patent in suit, assuming its validity. The contention of the defendants is that their use of these materials was experimental only, incidental to their search for a new agent which they claim to have discovered, and was not a commercial operation. It is shown, however, that during these operations some two hundred pounds of saponin was used and that the resulting pearl essence, or the principal part, was afterwards sold by the defendant and found its way into commerce through the usual channels. The amount of product, while not large, would be large enough to be included in any accounting that would be taken.

After August 5, 1931, the defendants used another substance or agent in the production of the essence, a new agent that they had discovered, to which they gave the trade name of "tec," and which they used to the exclusion of other agents in their commercial operations. The other steps of the process were not changed, and this "tec" was used in exactly the same way that the defendants had previously used soap or saponin. Obviously the question of infringement after August 5th depends upon whether this substance called "tec" was an agent of the patent. At the trial the defendant elected, and was permitted by the court, to keep secret the nature and composition of its agent called "tec," being warned, however, by the court that it must accept the consequences. The article was produced and certain experiments made upon it by chemists in the presence of the court to show that it did not react to certain tests as would soap or saponin; and it was definitely testified by witnesses for the defendants that "tec" is not a soap or a saponin. Defendants claim that the evidence shows that "tec" is not physically or chemically the equivalent of soap or saponin. If the defendants had disclosed the nature of the composition of "tec," the plaintiff would have had the burden of showing that it was a detersive agent within the scope of the patent. By reason of such refusal to disclose there arises, at least, a strong inference, available to the plaintiff, in establishing its prima facie case, that "tec" is an agent of the patent. Defendants cannot complain, if they make it impossible for the plaintiff to investigate the composition and detersive properties of "tec," that the burden of proof resting upon the plaintiff is thereby greatly lightened.

"Where the defendant conceals the art or articles he uses, and declines to produce it for inspection, there is a strong presumption that it is identical with the one covered by the plaintiff's patent, particularly when from other evidence it is apparent that he intends to imitate it as closely as he can without detection." Robinson on Patents, vol. 3, § 1041.

"While plaintiff must demonstrate infringement, similarity of result may justify a conclusion of infringement, in the absence of proof that in some respects the secret process (which need not, however, be disclosed) or the resulting product differs from the patented process or product." Dick Co. v. Barnett (C. C. A.)' 277 F. 423, 424; Union Paper Bag Mach. Co. v. Binney, Fed. Cas. No. 14,387.

Defendants have taken the position that "tec" is not a soap or a saponin, and, in fact, not a detersive, but refer to it as a "cleansing agent." I consider the words as used herein and in the letters patent as being synonymous, to all intents and purposes. Dictionary definitions furnish an authority.

Since "tec" is used as a detersive and accomplishes the same result as saponin in operations otherwise similar to the plaintiff's, I think a conclusion is warranted that "tec" is an agent possessing the detersive properties of saponin in the sense used in the patent, and that the plaintiff is entitled to the benefit of the finding that a prima facie case of infringement subsequent to August 5 has been made out, that is, that the infringement shown to have occurred prior to August 5th by the use of saponin continued subsequent to that date by the use of "tec," in the absence of any testimony tending to show that "tec" does not possess the detersive properties of soap or saponin. Certainly "tec" appears to be the functional equivalent of saponin and to operate to remove proteinaceous material from the guanin crystals in the same manner and under the same circumstances as saponin.

The defendants attack the validity of the patent on the ground of prior knowledge and use by one Petow and by the defendants themselves. Mr. Petow's use of soap or saponin for the preparation of his pearl essence in New York was alleged to have been begun about 1915, and that of the defendant to have begun in 1919 and to continue up to the time of the temporary discontinuance of their business in 1930, the applicable axiom being that that which infringes, if later, anticipates, if earlier. The

testimony of Mr. Petow, corroborated to some extent by his son, a young boy at the time in question, is that he used a soap in the form of a powder, called Gold Dust, as his cleansing agent, to remove the foreign matter from the guanin crystals which came off the fish with the scales. It was also testified that Mr. Petow described this process to Mr. Ganzanotti, an employee of the defendant, and oral testimony was given by him and by one or more other persons to the effect that a soap solution was used by the defendants in their process and business in Brooklyn and elsewhere since 1919. Certain corroborative evidence is claimed in the records of the defendants that they bought considerable quantity of pearl essence from Petow between 1918 and 1920; and a picture of Mr. Petow in a magazine in July, 1921, showing that he was engaged at that time in the business of making pearl essence, was introduced.

The oral testimony concerning the prior use by Petow and the defendants was objected to at the time of the trial and admitted de bene esse, subject to corroboration and support by other evidence, as is required by the rule in this circuit. While the testimony of Mr. Petow and the other witnesses appeared to have been given with the utmost sincerity, and there is no reason to doubt their credibility as witnesses, the difficulty, as stated by Judge Putnam in the case below referred to, "is that the settled rules with reference to those Departmental adjudications which are of a quasi judicial nature involving the hearing of parties and the consideration of what is offered by them, *rigidly applied in this circuit,* stand across the path of the case thus made by the respondents below."

The case referred to, of course, is Emerson & Norris Co. v. Simpson Brothers Corporation (C. C. A.) 202 F. 747, 750, the most important case on this rule in this circuit, and seemingly exactly applicable to the instant case and the situation above referred to. Judge Putnam, for the Circuit Court of Appeals for this Circuit, continues: "This case, however, developed the underlying rule that ordinarily, in cases like the present, it is necessary that the anticipations should be supported, not merely by the testimony of one or numerous witnesses relating to matters many years previous, *but by concrete, visible, cotemporaneous proofs which speak for themselves.*" "In that case [Brooks v. Sacks, 81 F. 403 (C. C. A. 1st Circuit)], the testimony of credible witnesses was rejected

because there were no cotemporaneous visible objects of that nature, *and solely for that reason.*" The court holds that *"something more than oral testimony, even of the highest character,* is required where there has been a considerable lapse of time." The italics are mine.

Both the Petow and defendants' prior uses related to matters occurring more than ten years previous to the trial. The cotemporaneous proofs show nothing of the character of the process carried on. They are not corroborative of, and do not support, the oral evidence as required by the rule.

It should also be noted that the testimony of these witnesses was somewhat vague as to dates, which of course was the important feature of their testimony, and was in some particulars impunged by another witness who contradicted the evidence as to the operation in the defendants' factory.

The situation seems to be one where the strict rule laid down by the court, through Judge Putnam in this circuit, must be applied, and, as the oral testimony of the witnesses as to prior use by Petow and the defendants was not supported by "concrete, visible, cotemporaneous proofs which speak for themselves," I consider that the defendants' proof of prior use is not sufficient to sustain this defense.

Defendants also claim that the first patent is invalid for want of invention and for insufficiency of disclosure, but I do not find the claim in these respects sufficiently supported to overcome the presumption of validity consequent upon the grant from the Patent Office. It follows that I feel obliged to hold the first patent valid and infringed. Claim 5, however, cannot be said to have been infringed after August 5, 1931.

*The Second Patent in Suit:*

This patent relates to a process for further purifying and bringing to a finished state the pearl essence which has been acted upon by the process of the first patent. Claims 1 and 2 are in suit and are as follows:

"1. A process for purifying pearl essence which consists in agitating pearl essence in a prepared and purified aqueous suspension, in bringing the pearl essence to the state of an aqueous paste, in adding to the said paste in small quantities and while mixing a liquid which is not miscible with water, capable of moistening the particles of pearl essence and of forming with the same a new paste the muddy water of which separates spontane-

ously, and in washing this new paste by mixing the same with water until the latter after having carried along the impurities contained in this paste flows out in a pure state.

"2. A process for purifying pearl essence consisting in agitating pearl essence in a prepared and purified aqueous suspension, in bringing the pearl essence to the state of an aqueous paste, in adding to this paste a varnish the solvent of which is not miscible with water, this addition being made in sufficiently small quantities so that the emulsion resulting from the mixture of the said paste and of the said varnish can be spontaneously destroyed in liberating the pure water originally incorporated with the paste of pearl essence, the said paste being subsequently washed with water."

The important part of the process described in these claims consists in mixing the aqueous pearl essence paste with a liquid which is immiscible with water, or a varnish the solvent of which is immiscible with water, to remove the water from the pearl essence particles. Several liquids are mentioned, especially amyl acetate, ether, etc., and in some cases a varnish or lacquer made by dissolving nitro cellulose in its solvent, amyl acetate. The action of the liquid or varnish is described in the patent as causing the elimination of the water from the aqueous pearl essence paste. This dehydrating is caused by the fact that the guanin crystalloids possess a greater affinity for such a liquid (or solvent) than they do for water, whereas the impurities in the paste more easily combine with water than with a liquid or solvent not miscible with water. The result is that the guanin crystalloids of the paste become associated with the water immiscible liquid or solvent, while the impurities associate with the water and can be readily removed.

Defendants claim that this patent is invalid because the above process is completely anticipated by the processes disclosed by Mr. Taylor while working in the Bureau of Fisheries in 1920, who produced his notes showing the result of his experiments, and also by the pamphlet above referred to published by Mr. Taylor, in both of which the vital step of the process of the patent does seem to be completely disclosed. In the pamphlet Mr. Taylor says: "Pearl essence may be found on the market in the form of suspension in acetone and amyl acetate. It is also sold in the form of a thick paste as crystals suspended in a viscous lacquer of celluloid and amyl acetate. * * * A method of preparing pearl essence in non-aqueous suspension devised by the author of this paper, depends upon the property of guanin crystals of being wetted by certain liquids, like ether, more readily than by water."

Defendants cite certain foreign patents as anticipation, among others a German patent to Keil & Plischke, in 1908, in which the patentee refers to his discovery as consisting of freeing the sediment that results from a water treatment of the scales from moisture and mixing it with elastic esther lacquer. Several other foreign patents in evidence indicate quite clearly that this invention is completely anticipated.

It is also claimed against this patent that the process was known and used both by Petow and by the defendants for several years prior to the application for this patent, and that the defendants have always used this process, and that, if it infringes now, it anticipated when first used.

The same objection to the evidence of prior use and knowledge by Petow and the defendants was made in the case of this patent as in the case of the first patent, and it is not taken into consideration for the same reason as in the other case. But, without such evidence, it seems clear from the record and exhibits that the vital process of the second patent was completely anticipated most definitely and completely by Taylor, and for that reason alone it should be declared invalid as claimed by the defendant.

The plaintiff is entitled to an accounting and to damages, but not to treble damages for a wanton infringement, as claimed. The matter of injunction may be considered on a motion for injunction.